J-S04043-16

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF C.L.H. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: A.M.S., NATURAL MOTHER | : | No. 1161 WDA 2015 |

Appeal from the Order Entered July 13, 2015
in the Court of Common Pleas of Warren County,
Orphans' Court, at No(s): AN 9 of 2015

BEFORE:    BOWES, OLSON, and STRASSBURGER,* JJ.

MEMORANDUM BY STRASSBURGER, J.:          **FILED JANUARY 27, 2016**

A.M.S. (Mother) appeals from the order of July 13, 2015, which granted the petition of Warren County Children and Youth Services (CYS) to terminate the parental rights of Mother and J.G.H. (Father)[1] to their daughter, C.L.H. (Child).  We affirm.

The trial court summarized the history of the case as follows.

> CYS's involvement with Mother and Father began while Mother was pregnant.  Mother and Father were homeless most of Mother's pregnancy.  [Child] was born [in October 2014].  The family obtained temporary housing at the Faith Inn.  The Faith Inn terminated that housing on November 14, 2014 because Father engaged in underage drinking and brought additional people to the shelter without permission.  The paternal grandmother informed CYS she would care for [Child].  The paternal grandmother also informed CYS that her landlord refused to allow Mother and Father on the premises.  While [Child] was in the custody of Mother and Father, both parents showed minimal interaction with [Child] and fed [Child] at intervals as long as nine hours.

---

[1]  Father's appeal from the termination order was voluntarily discontinued by order of September 4, 2015.

*Retired Senior Judge assigned to the Superior Court.

The incident at McDonald's Restaurant on November 15, 2014 led to the removal of [Child] from the custody of Mother and Father. The paternal grandmother brought [Child] to McDonald's to allow Mother and Father to visit with the child. The paternal grandmother left to attend a theater production. Father left to go to the BiLo grocery store. While Father was not present, Mother placed [Child], in an unsecured manner, on the table and began to read text messages on Father's phone. One witness in a prior proceeding stated that Mother reached over [Child] to retrieve Father's phone, became engrossed in reading messages, and appeared to be inattentive to the baby. Due to Mother's neglect, [Child] fell off the table and onto the floor. [Child] suffered two parietal skull fractures and an overlying hematoma. When an ambulance arrived, Mother and Father initially resisted transporting [Child] to Warren General Hospital. Subsequently, Warren General Hospital transferred [Child] to Pittsburgh Children's Hospital.

In response, the District Attorney's Office charged Mother with simple assault and endangering the welfare of children. Mother pled guilty to endangering the welfare of children on June 19, 2015. The [c]ourt sentenced Mother, on the same day as her guilty plea, to "stand committed to a State Correctional Institution for a minimum period of twelve (12) months to a maximum period of thirty-six (36) months." Mother's transport to a state correctional institution would occur after the termination of parental rights hearing. The sentence court entered an additional condition that Mother would have no contact or communication with [Child] unless approved by the dependency court.

During Mother's time in the Warren County Prison (hereinafter "Prison"), she demonstrated troubling behavior. From November 20, 2014 to July 13, 2015, Mother served 237 days in Prison. She spent 53 days in general population and 184 days in isolation or detox cells. Mother engaged in 17 instances of misconduct; she induced herself to vomit and flung the vomit around her cell, urinated on the floor, ate paint chips, intentionally hit her head against the walls, tried to push past guards, kicked other inmates, and destroyed property. Prison personnel explained that Mother would always escalate very minor conflicts until it resulted in her receiving time in isolation

- 2 -

or detox cells. The most serious escalation resulted in prison personnel placing Mother in a restraint chair. Mother took her anti-depressant medication during this time. Aside from a one month period when Mother did not engage in misconduct, Mother had numerous write-ups throughout her stay in Prison. Her conduct frequently resulted in disciplinary action by Prison personnel, which limited her privileges to have visitors.

Mother obtained her release from Prison for one day on January 18, 2015 because a friend was willing to let her stay with him. She spent that day harassing Father, resulting in her re-incarceration. After January 18, 2015 but before June 19, 2015, Mother could have obtained her release from Prison again if she could obtain housing. She has no connection to her father because he is incarcerated. The maternal grandmother cannot provide for Mother due to the lack of resources, health problems, past drug use, and unwillingness to help care for [Child]. The paternal grandmother also refuses to help Mother. Mother also does not have any stable peer supports. Transitional housing sources refuse to accept Mother due to prior misconducts. Therefore, Mother remained in Prison because she had no place to stay prior to sentencing.

* * *

Mother did not have the same opportunities [as Father] regarding [Child] because of her misconduct during her incarceration. Mother's misconduct in Prison was the cause of her lack of interaction with [Child]. Additionally, Mother also lost custody of [Child] less than a month into [Child]'s life. [] Mother worked on learning the materials regarding parenting as required in the Family Service Plan. However, Mother was very distracted and would shift conversation to her relationship with Father. Mother alternated between expressing anger toward Father and wanting to reignite a relationship with Father. When CYS caseworkers redirected Mother back to the topic of caring for [Child], Mother would still speak about [Child] regarding the connection to Father.

Mother's obsessive conduct regarding Father, even during court proceedings, led the [c]ourt to order an evaluation of Mother. Mother had average intelligence, a borderline working

memory, and serious maladaptive behavior problems. Carl Longosky, a licensed psychologist in Pennsylvania, testified as an expert in this matter. The expert explained that Mother's problems would result in her difficulty in caring for herself, much less a child. Mother's poor memory would create difficulties in maintaining her own health because she has cardiac problems that require care. The poor memory would also cause problems with regular care of the child. Mother would also need to re-enter treatment for her past trauma and maladaptive disorders, which would require considerable oversight to ensure Mother's commitment to treatment. Mother also requires treatment for ADHD, anxiety, anger management, and impulse management. Furthermore, Mother would require ongoing parenting training and supervision. She has a substantial sentence to serve and failed to adjust to the local prison.

Orphans' Court Opinion, 8/27/2015, at 1-6 (citations and unnecessary capitalization omitted).

On June 15, 2015, CYS filed a petition to terminate Mother's parental rights under 23 Pa.C.S. § 2511(a)(1), (2), and (5). The orphans' court held a hearing on the petition on July 13, 2015. On that same date, the court entered a decree terminating Mother's parental rights under subsections 2511(a)(2) and (5). On July 27, 2015, Mother timely filed a notice of appeal and statement of errors complained of on appeal. The orphans' court filed its opinion on August 27, 2015.

Mother presents the following questions on appeal.

1. Whether the trial court erred and /or abused its discretion in involuntarily terminating Mother's parental rights where such determination was against the weight of the evidence and was not supported by clear and convincing evidence?

- 4 -

2.     Whether the trial court erred and/or abused its discretion in terminating Mother's parental rights … when Mother was incarcerated the entire seven months preceding filing of the Petition, utilized the services and programs available to her while incarcerated, made progress with those services and programs, attempted to contact the Child through the Caseworker, and whose sentence is not of such a length that her inability to presently care for the Child cannot be remedied in the near future?

3.     Whether the trial court erred and/or abused its discretion in terminating Mother's parental rights … where little or no efforts were provided by CYS to facilitate visitation and/or reunification between Mother and Child?

4.     Whether the trial court erred and/or abused its discretion in terminating Mother's parental rights … where CYS refused to permit visitation with Mother during her incarceration due to her alleged poor behavior, where Mother was not provided with any mental health or anger/impulse management counseling and where a psychological evaluation determined Mother would be capable of caring for or learning to care for the Child if Mother was given anger/impulse management counseling?

5.     Whether the trial court erred and/or abused its discretion in determining there was sufficient evidence that termination of Mother's parental rights would best serve the developmental, physical, and emotional needs and welfare of the Child?

6.     Whether the trial court erred and/or abused its discretion in terminating Mother's parental rights where the record was void of any studies or evaluations as to whether any parent-child bond exists between Mother and Child and where there was not clear and convincing evidence that the Child would not be harmed by the termination of Mother's parental rights?

Mother's Brief at 5 (suggested answers omitted).

We consider Mother's questions mindful of the following.

In cases involving the termination of a parent's rights, our standard of review is limited to determining whether the order of

- 5 -

the trial court is supported by competent evidence, and whether the trial court gave adequate consideration to the effect of such a decree on the welfare of the child.

Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand…. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re C.W.U., Jr.*, 33 A.3d 1, 4 (Pa. Super. 2011) (internal quotations and citations omitted).

Our courts apply a two-part analysis in considering termination of parental rights.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re P.Z.*, 113 A.3d 840, 850 (Pa. Super. 2015) (quoting *In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007)).

"The statute permitting the termination of parental rights outlines certain irreducible minimum requirements of care that parents must provide for their children, and a parent who cannot or will not meet the requirements

within a reasonable time following intervention by the state may properly be considered unfit and have his parental rights terminated." *In re Z.P.*, 994 A.2d 1108, 1118 (Pa. Super. 2010) (quoting *In re B.L.L.*, 787 A.2d 1007, 1013 (Pa. Super. 2001)).

"Imprisonment is but one factor the trial court must consider in analyzing a parent's performance." *In re E.A.P.*, 944 A.2d 79, 83 (Pa. Super. 2008). "While incarcerated, a parent is expected to utilize whatever resources are available to him while in prison in order to foster a continuing close relationship with his children. Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities." *Id.* (internal citation and quotation marks omitted).

The governing statute provides as follows, in relevant part:[2]

**(a) General rule**.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

* * *

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of

---

[2] Mother also challenges termination under 23 Pa.C.S. § 2511(a)(2). However, based upon our conclusion as to subsection (a)(5), we need not consider this argument. *See In re N.A.M.*, 33 A.3d 95, 100 (Pa. Super. 2011) ("We must agree with the trial court's decision as to only one subsection of 23 Pa.C.S. § 2511(a) in order to affirm the termination of parental rights.").

- 7 -

time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

* * *

**(b) Other considerations**.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. …

23 Pa.C.S. § 2511.

Although Mother presents six questions on appeal, she groups them in the argument portion of her brief into two sections: (1) a challenge to the orphans' court's determination that CYS satisfied its burden under subsection (a) of the statute, and (2) an attack upon the findings of the orphans' court as to subsection (b). We shall conduct our review accordingly.

We begin with an examination of CYS's burden pursuant to subsection (a). Under subsection (a)(5), CYS had the burden to establish the following five factors:

(1) the child has been removed from parental care for at least six months; (2) the conditions which led to the child's removal or placement continue to exist; (3) the parents cannot or will not remedy the conditions which led to removal or placement within a reasonable period of time; (4) the services reasonably available to the parents are unlikely to remedy the conditions

which led to removal or placement within a reasonable period of time; and (5) termination of parental rights would best serve the needs and welfare of the child.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1273-74 (Pa. Super. 2003).

Mother does not contest that Child was removed from her care for at least six months, or that the conditions which led to Child's placement continue to exist. Rather, Mother argues that the orphans' court erred in concluding that the statutory elements were proven because (1) "while not a perfect parent, she certainly utilized the services provided to her," Mother's Brief at 32; (2) the services CYS provided were inadequate, *id.* at 22-26; and (3) she will be able to resume her parental duties upon being paroled.

The orphans' court found that "Mother was incapable of accepting responsibility for her own actions." Orphans' Court Opinion, 7/13/2015, at 11. She continually "erect[ed] barriers to reunification [with Child] through self-destructive behavior." *Id.* at 14. Mother's interest in Child "focused on her ability to use [Child] as a tool to either punish or reunite with Father." *Id.* at 11.

The orphans' court also determined that Mother cannot and will not benefit from treatment and services "without constant intervention from CYS, mental health providers, and medical providers for the foreseeable future." *Id.* at 12. Yet, her participation in CYS services was significantly limited by her "distraction with her relationship with Father." *Id.* The lack

of additional treatment for Mother "is immaterial because there is no evidence to suggest that her behavior would change." *Id.* at 15. Further, "[e]ffective treatment requires Mother to have substantial community support that Mother refuses to obtain." *Id.* at 12. The orphan's court explained,

> Mother has no support system to help her, which will leave her unable to care for [Child]. After [Mother] left foster care, she became homeless. She has no connection to her father. [Child's] maternal grandmother cannot provide for [Mother] due to the lack of resources, health problems, past drug use, and unwillingness to help care for [Child]. The paternal grandmother also refuses to help Mother. Mother also does not have any stable peer supports. Transitional housing sources refuse to accept Mother due to prior misconducts. … Mother was aware that she had serious cardiac problems but refused to see a doctor until her incarceration. She is immature and incapable of caring for herself.

*Id.* (citations omitted). This is all on top of the facts that Mother will be serving her state prison sentence and that her ability to obtain parole is speculative, especially given that she spent more than three quarters of her time in the county jail in isolation for misconduct. *Id.* at 13.

Regarding Child's best interests, the orphans' court opined as follows.

> In the present case, both parents repeatedly engage in self destructive conduct, are incapable of caring for themselves, have little to no interest in [Child], and were negligent in their care of [Child]. CYS removed [Child] from the custody of the parents when [Child] was less than one month old. [Child] was approximately 10 months old at the time of the termination of parental rights hearing. As an infant, consistency and trust are critical to [Child's] development. A lack of consistency and trust will irreparably and negatively impact how a child processes

information and respond[s] to external stimuli.  The damage may result in lower intellectual function[] and maladaptive behavioral problems.  More importantly, developing a bond with a consistent adult will positively impact [Child's] future.  At such a critical stage of child development, the [orphans' c]ourt will not subordinate the needs of [Child] to the parents' speculative assertions that they might one day fulfill their parental duties.

*Id.* at 8-9.

The record contains the following evidence in support of the orphans' court's decision.  CYS provided services to Mother and Father before Child was born in the form of housing, but they were evicted therefrom for failure to obey rules.  N.T., 7/13/2015, at 94-95.  While incarcerated for causing Child's injuries, Mother was provided with a number of services by CYS. Mother was the first incarcerated parent in Warren County to receive parenting classes from CYS, receiving nine visits from a parent educator between April 14 and July 7, 2015.  *Id.* at 11.  As a result, Mother had "more individual instruction than most parents receive" in a "particularly intensive specialized course."  *Id.* at 26.  Mother also was the first Warren County inmate to receive Independent Living (IL) services, *id.* at 89, although Mother said that she did not want them, *id.* at 87.  CYS attempted to procure anger management counselling and other mental health treatment for Mother, but was unable to do so "because of where she is and because of her behavior."  *Id.* at 175 (noting the lack of internal CYS

workers to provide such treatment and Mother's unavailability to attend outpatient programs while incarcerated).

Rather than utilizing these services and time with CYS workers to learn about Child's well-being and how she could better parent Child, Mother spent much of the time with CYS inquiring about Father:[3]

> [I]t actually got to the point where I had to tell her multiple times [that] I'm here for [Child], I'm here for you, this is not about [Father]. If [Father] gets brought up, I am leaving, and it did get up to the point where I said, Okay, I'm leaving, and I had to end the visit.

*Id.* at 165-166 (testimony of CYS caseworker Chelsea Deppas). *See also id.* at 12-15, 81-83, 104-106. Mother told CYS workers that she did not want to parent Child unless she could parent Child with Father.[4] *Id.* at 106, 122. Mother attempted to use Child as a pawn to force Father "to get back with her." *Id.* at 149. Upon considering that Father may one day introduce a stepmother into Child's life, Mother indicated that she would "slap [Child] across the F-ing face" if Child ever called another woman "mom." *Id.* at 15.

Mother stated that the only reason she accepted IL services was "so IL would pay for her housing so she could get out of jail." *Id.* at 87. Mother

---

[3] Indeed, when Mother was served with the petition to terminate her parental rights, her immediate concern was about Father's reaction. N.T., 7/13/2015, at 99.

[4] Father indicated from the time Child was found dependent that he wanted no contact with Mother and had no interest in resuming his relationship with Mother. N.T., 7/13/2015, at 141.

also indicated that her desire for individual sessions was motivated by her desire to get out of prison isolation for a while. ***Id.***

Even when released from prison eventually, Mother likely will struggle to find or keep employment, "not only because of the lack of job skills, such as teamwork and being able to respect authority figures and so on, but also because of the lack of social skills and personal etiquette, low impulse control." ***Id***. at 83.

Mother claims that she is incapable of controlling her behavior without CYS providing services to help her, Mother's Brief at 22-26, and that CYS's reliance upon Mother's prison misconduct "was simply an excuse to avoid providing adequate reunification services and regular visitation." ***Id.*** at 24. However, Mother simultaneously notes that her prison behavior improved despite the lack of services, with only one of her 17 misconducts occurring between May 1 and July 13, 2015. ***Id.*** at 28. Thus, Mother acknowledges that she was able to control her behavior without receiving services, but she nonetheless chose to engage in misconduct knowing that it would prevent her from seeing Child. N.T., 7/13/2015, at 36-37 ("[CYS caseworker Deppas] reinforced it with her, if you're not in lockup, we can bring the baby down to see you more often, and they opened the door to take her out of there and she immediately started hitting the guard at that time, to the point they had to handcuff her and take her upstairs. She had the

opportunity to have visits however often [CYS] wanted to bring [Child] in but [Mother] just wouldn't do it."). Mother's almost complete lack of contact with Child for the overwhelming majority of Child's life is the fault of Mother.

Rather than persuade us that the trial court's decision was unsupported by the evidence, Mother has convinced us that she is continuing to blame others for her failure to parent Child appropriately. *See*, *e.g.*, *id.* at 16 ("[O]ftentimes she would blame [Father] for many of the things that were a problem."); *id.* at 82 ("A lot of the time she blamed [Father and] said that [Father] should be in jail, and this was his fault.").

The only witness who offered testimony that favored Mother's position was Carl Longosky, the licensed psychologist who examined Mother. Mr. Longosky did opine that Mother had the potential to parent Child with support, training, and treatment, if Mother "buys into those supports, cooperates with them, and follows through with her treatment." *Id.* at 63. However, Mr. Longosky's opinions were based upon a single session with Mother in February 2015 and limited information about her history.[5] *Id.* at 52, 65.

Further, Mr. Longosky offered the opinions that "the best predictor of future behaviors is past behavior," *id.* at 57, and that if Mother was to be reunited with Child, it would have to be done "rather quickly" and could not

---

[5] For example, Mr. Longosky was unaware that Child had been injured. N.T., 7/13/2015, at 56.

- 14 -

"wait a whole lot longer." *Id.* at 70. This is because "[t]here are critical periods in child development where certain things need to be happening to them or that sometimes we have problems developing." *Id.* Mr. Longosky opined that "it would be very difficult for her to raise her child appropriately" without supports and community support, *id.* at 63-34, of which Mother has none. Given Mother's history of poor cooperation with service providers and future incarceration for up to several years, Mr. Longosky's testimony supports the orphans' court's decision that it is in Child's best interests to terminate Mother's parental rights now rather than to wait to see if she is paroled, finds heretofore unknown community supports, and suddenly adopts the opposite attitude and behaviors from those she has exhibited thus far.

Based upon this record, the orphans' court committed no error or abuse of discretion in concluding that CYS met its burden of proving that Mother cannot or will not remedy within a reasonable period of time the conditions which led to Child's removal, that continued services for Mother are unlikely to remedy within a reasonable period of time the conditions which led to removal, and that termination of Mother's parental rights would best serve the needs and welfare of Child.

We next consider whether the orphans' court gave adequate consideration to the welfare of Child under subsection 2511(b). "Intangibles

such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child." ***In re K.Z.S.,*** 946 A.2d 753, 760 (quoting ***In re C.P.***, 901 A.2d 516, 520 (Pa. Super. 2006)).

> The court should also consider the importance of continuity of relationships to the child…. The court must consider whether a natural parental bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship. Most importantly, adequate consideration must be given to the needs and welfare of the child.

***Id.*** (internal citations omitted). "The mere existence of an emotional bond does not preclude the termination of parental rights." ***In re N.A.M.***, 33 A.3d 95, 103 (Pa. Super. 2011).

Mother claims that the orphans' court erred or abused its discretion in determining that termination of Mother's parental rights would best serve Child's developmental, physical, and emotional needs. Mother's Brief at 34. Mother maintains that, without a study or evaluation of the bond between her and Child, there was not clear and convincing evidence of record that Child would not be harmed by termination of Mother's rights. ***Id.*** at 6, 34. In support, Mother points to testimony that "even after nearly seven (7) months of little to no contact between Mother and [Child], [Child] still seemed to recognize Mother's voice," ***id.*** at 35, and argues that the testimony of Child's bond with prospective adoptive parents "was conflated and, to a certain extent, incredible." ***Id.*** at 36.

Mother's arguments are meritless. First, it has long been the law of this Commonwealth that, "[i]n analyzing the parent-child bond, the orphans' court is not required by statute or precedent to order a formal bonding evaluation be performed by an expert." *In re K.K.R.-S.*, 958 A.2d 529, 533 (Pa. Super. 2008). Second, this Court will not second-guess the credibility determinations of the orphans' court. *In re A.J.B.*, 797 A.2d 264, 266 (Pa. Super. 2002). Third, nothing in the record suggests that Child has any bond with Mother such that Child will be harmed by its severance. *In re K.Z.S.*, 946 A.2d at 762-63 ("In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists.").

Finally, the orphans' court's determination that Child's needs will be best served by termination of Mother's parental rights is supported by the record. As discussed in connection with our subsection (a) analysis above, Mother is unable to provide Child the care she needs. Child was less than one month old when she was removed from Mother's care. After Mother's negligence caused Child to fall and fracture her skull in two places, Mother's only contact with Child has been through a glass window at the prison which lasted approximately 15 minutes because Child "started to become fussy and squirmy and she wanted to leave," N.T., 7/13/2015, at 166; and visits after court hearings, during which Child was asleep, was handed back to the CYS worker by Mother after five minutes because Mother did not want to parent

her without Father, or became upset when she was given to Mother and pushed away from her. *Id.* at 121-23, 166-67.

On the other hand, Child appears to have formed a bond with Mother's cousin Carla, who has been identified as a permanent resource for Child. *Id.* at 169 (recounting how Child pushed away from the CYS worker and reached for Carla, "which is the first time she had done that with anybody"); *see also id.* at 125-26 (testimony that Child is eager to see Carla, nestles into Carla, and cries when being transported away from Carla). Accordingly, we discern no error or abuse of discretion in the orphans' court's finding that termination of Mother's parental rights best serves Child's best interests.

Therefore, because the record supports the orphans' court's conclusions under subsections 2511(a)(5) and (b), and Mother has identified no error of law or abuse of discretion, we affirm the order terminating Mother's parental rights to Child.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/27/2016

- 18 -